# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NAV TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> JANTZEN FUGATE, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION AND DISSOLVING TEMPORARY RESTRAINING ORDER <br><br> Case No. 2:21-cv-00356-JNP <br><br> District Judge Jill N. Parrish |

Before the court is Nav Technologies, Inc.'s motion for a preliminary injunction against its former employee, Jantzen Fugate. The court held an evidentiary hearing on the motion on July 6 and 7, 2021. The court DENIES the motion.

## FINDINGS OF FACT

1. Nav is a company that operates a website marketed to small business owners. Entrepreneurs can log on to the website, enter their information, and be matched with lenders willing to offer business loans. Presumably, Nav receives a commission for matching lenders with borrowers, but the parties did not present explicit evidence on this point.

2. Nav's website also contains links to other companies that provide services to small businesses, including credit cards, website development, on-line sales tools, incorporation services, and legal services. If a small business owner clicks one of these links and purchases a product, Nav receives a commission.

3. The Nav website also offers free credit reports and free tools to help small businesses to improve their credit scores. Nav offers these services for free in order to promote traffic to its website and to build good will with small business owners.

4. Fugate started a company called Business Loan Broker Academy (BLBA). The company sold training to individuals who wanted to either become a business loan broker or improve their skills as a broker. A business loan broker helps small businesses find lenders willing to extend a loan. Fugate was essentially the only employee of BLBA and provided all of the training and mentorship provided through the company. BLBA operated through the web address businessloanbrokeracademy.com.

5. In March 2019, Fugate licensed the web domain name BusinessLoanBroker.com.

6. Around July 2019, Nav began negotiations with Fugate to acquire BLBA. During these negotiations, Fugate disclosed to Nav his rights to the BusinessLoanBroker.com web domain. Fugate also disclosed his idea to develop a directory of reputable business loan brokers that small business owners could consult when choosing a broker. Fugate proposed using the BusinessLoanBroker.com web domain to host the broker directory as well as other content relevant to business financing.

7. In November 2019, Nav and Fugate came to an agreement regarding the purchase of BLBA. Because Fugate was the face of BLBA, it was important to Nav that Fugate continue to operate BLBA after the acquisition. Accordingly, Nav asked Fugate to manage BLBA as a Nav employee after the purchase. Nav negotiated a relatively low initial purchase price and a relatively high salary and bonus structure to incentivize Fugate's continued involvement with BLBA.

8. The acquisition of BLBA was memorialized through three separate contracts signed by Nav and Fugate on or around the same date in November 2019. The first contract was the Asset Purchase Agreement (Purchase Agreement). The Purchase Agreement required Nav to pay Fugate $75,000 and to transfer 9,932 shares of Nav's common stock to Fugate on the closing date. The contract stipulated that the stock had a value of $2.5171 per share, or approximately $25,000. The Purchase Agreement listed the assets that Fugate was transferring to Nav as part of the purchase of BLBA, including five domain names. The domain name, BuisinessLoanBroker.com, was not included in the list of domain names included in the transfer of assets.

9. The second contract was the Employment Agreement. The Employment Agreement provided that Fugate would receive an annual salary of $170,000. This contract also provided for much larger bonuses to be paid to Fugate if BLBA achieved certain net revenue goals during its first three years of Fugate's employment. The Employment Agreement stated that Fugate was an at-will employee. But if Fugate quit his position for "good reason" or if Nav terminated his employment without "cause" within the first two years of the contract, and if he signed a release of claims, Fugate was entitled to severance payments calculated from his annual salary, any earned bonuses, and employee benefits for a period of time.

10. The third contract was the At Will Employment, Proprietary Information, Invention Assignment, Noncompetition and Arbitration Agreement (At-Will Agreement). This contract was a generic employment contract that Nav required all of its employees to sign. The At-Will Agreement contained a covenant not to compete. This provision stated that during the period of his employment and for 12 months after the termination his

employment relationship, Fugate could not be an employee of, operate, manage, or affiliate with any business "in direct competition with or otherwise substantially similar to [Nav's] business."

11. Around the same time that Fugate signed these contracts, Nav paid him $75,000 as part of the purchase price of BLBA. But Nav did not transfer its shares to Fugate. In January 2021, about 14 months after the closing date for Nav's purchase of BLBA, a Nav employee contacted Fugate and requested that he sign an "Adoption Agreement" so that Nav could transfer 9,932 shares of Nav's common stock to him as part of the purchase price. Fugate did not sign the Adoption Agreement and Nav did not transfer the shares to him. He testified that he did not sign the Adoption Agreement because Nav's share price had fallen and he believed that he was entitled to more shares of stock to equal the $25,000 value specified in the Purchase Agreement.

12. On December 10, 2020, Fugate's supervisor, Joel Jensen, expressed concerns about Fugate's job performance. Jensen stated to Fugate that he was not responsive to emails or requests to provide videos, that too much of his calendar was marked off as unavailable, that he was not responding to BLBA inquiries promptly, and that he was not completing required internal reports. Fugate responded that he would fix most of the areas of concern articulated by Jensen.

13. As part of his employment duties with Nav, Fugate administered a Facebook group to promote BLBA. On December 9, 2020, Fugate posted a picture of himself with two other individuals. The caption to the picture read: "Big. Things. Happening for these guys." Jensen, saw the Facebook post on December 15, 2020, and asked whether Fugate had travelled the prior week. Fugate responded that he had gone to Louisiana to do some

training for a company called Pro Finance. Fugate represented that he did not provide the training on behalf of Nav, but that he was providing the training on his own behalf. Jensen expressed some frustration that Fugate had not preauthorized the trip with Nav. He disagreed with Fugate's representation that he could perform trainings on his own behalf because his "non-compete is related to all things business finance and brokering."

14. At the evidentiary hearing, Fugate testified that he had provided credit repair training to Pro Finance. He further represented that even though he had provided the training of his own accord, he posted the picture on the BLBA Facebook group because it created the impression that he was a hands-on trainer to individuals who may be interested in purchasing business loan broker training from BLBA. Fugate testified that he did not state in the post that he was providing credit repair services training on his own behalf because he wanted to "paint an illusion" that would entice individuals to pay for BLBA training.

15. In April 2021, Fugate informed Jensen that he did not intend to stay with Nav past November, the two-year anniversary of his employment with the company. He stated that he felt that Nav had not supported his efforts at BLBA and that he had not earned the bonuses that he had anticipated. Fugate said that he wanted to begin the process of turning over the management of BLBA to another Nav employee. Jensen stated that he was fine with teeing up a transfer of BLBA to another Nav employee. But Jensen also expressed frustration with the low level of effort that Fugate was putting into BLBA. For example, Jensen asserted that Fugate had not been recording new course videos or producing other "deliverables" for BLBA. Jensen asked whether he could count on Fugate to "step up through November" or whether he was just biding his time.

16. On May 19, 2021, Nav fired Fugate. Nav offered Fugate six weeks of severance pay if he signed a Separation and Mutual Release Agreement. Fugate declined to sign the document.

17. Also on May 19, 2021, Fugate created a Facebook group titled Business Loan Broker.com. Many of the individuals that signed on as members of this new Facebook group were also BLBA members. On May 24, 2021, Fugate posted the following message to the group: "MAJOR ANNOUNCEMENT COMING THIS WEDNESDAY @ 9EST." On May 29, 2021, Fugate posted a new message: "Because I've been sent a Cease and Desist letter in regards to this group being created, I'll be postponing my announcement. Stay tuned, it's getting spicy." On May 29, 2021, Fugate changed the privacy setting of the group from public to private. Fugate did not make any other posts to the group.

18. At the evidentiary hearing, Fugate testified that he had intended to announce the creation of a free business loan broker directory. But because of a cease-and-desist letter he had received from Nav, he had decided to stop all efforts to promote the new Facebook group.

19. On June 8, 2021, Fugate emailed an invoice to Titanium Capital Solutions, a BLBA member, requesting payment of $5,000. Fugate testified that the invoice was for providing leads for credit repair services as well as well as helping Titanium to develop its credit repair services. Fugate also stated that he was helping Titanium to set up other product offerings to small businesses, including entity formation, business plan creation, and website creation.

20. On June 10, 2021, Nav filed a lawsuit against Fugate, alleging causes of action for breach of contract, trademark infringement, and cybersquatting. On the same day, Nav moved for a temporary restraining order (TRO) and for a preliminary injunction.

21. On June 23, 2021, the court held a hearing on Nav's request for a TRO. At the hearing, the parties indicated that they had agreed to a enter a stipulated TRO in order to give Fugate time to hire an attorney.

22. On July 6 and 7, 2021, the court held evidentiary hearings on Nav's request for a preliminary injunction.

**CHOICE OF LAW**

There are three separate choice of law clauses at issue in this case. The Purchase Agreement contains a Delaware choice-of-law clause. The Employment Agreement contains a Utah choice-of-law clause. Finally, the At-Will Agreement contains a Pennsylvania choice-of-law clause. Because Nav seeks to enforce the non-compete clause contained in the At-Will Agreement, it argues that the court should apply Pennsylvania law for the purposes of its motion for a preliminary injunction. But the parties concede that all three contracts should be interpreted together because they were signed contemporaneously and were intended to be part of a single agreement between Nav and Fugate regarding the sale of BLBA and Fugate's continued involvement with this enterprise. This raises the question of whether each contract should be governed by a different state's law or whether the law of one of the states should govern all of the contracts.

Additionally, Fugate argued that this court should not follow the choice of law provision in the At-Will Agreement because the contract was between a Utah company and a Utah employee for work principally performed in Utah. Fugate asserted, without citation, that without a discernable connection to Pennsylvania, the choice-of-law provision should not control.

Given the lack of briefing on the choice-of-law issue, and because the parties have not pointed to any material differences between Delaware, Pennsylvania, and Utah law that would affect the outcome of this motion, the court declines to take up the choice-of-law issue at this stage

of the litigation. The court therefore cites Delaware, Pennsylvania, and Utah substantive law throughout this Order.

The court applies Tenth Circuit law to determine the appropriate standard for granting a preliminary injunction.

**ANALYSIS**

To obtain a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (citation omitted)).

Nav must first show a substantial likelihood that it will ultimately prevail on its claims against Fugate. Nav asserted three causes of action in its complaint: breach of contract, trademark infringement, and cybersquatting. But Nav based its motion for a preliminary injunction exclusively on its claim for breach the non-compete clause of the At-Will Agreement. Nav argues that Fugate has (or will) breach this clause in two ways. First, it asserts that Fugate improperly competed by providing credit repair consulting services to Pro Finance and Titanium Capital. Second, Nav contends that Fugate's creation of the BusinessLoanBroker.com Facebook group indicates that he plans to compete with Nav in the future. Fugate argues that Nav has not shown a

substantial likelihood that it will prevail on its breach of contract claim. Additionally, he asserts that Nav will not prevail on its contract claim because Nav breached the overarching agreement between the parties first by failing to transfer the stock to Fugate and by failing to provide severance pay and other employee benefits upon his termination.

**I.      CONSULTING SERVICES**

Fugate provided credit repair consulting services to both Pro Finance and Titanium Capital. He testified that he was helping these two companies to develop credit repair service offerings to small businesses seeking loans. Fugate also sold sales leads for credit repair services to Titanium Capital and helped it to develop other product offerings to small businesses such as entity formation and website development. These consulting services were provided both during Fugate's employment with Nav and shortly after his termination.

Nav argues that these consultation services violated the non-compete clause of the At-Will Agreement. Through this clause, Fugate agreed that during his employment and for a period of 12 months after his separation from Nav, he would not

> (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate [himself] with any business, (a) in direct competition with or otherwise substantially similar to [Nav's] business or (b) any other line of business in which [Nav] was engaged at any time during [his] employment with [Nav].[1]

---

[1] This is merely part of a particularly long run-on sentence filled with a jumble of dependent clauses and extended lists. The At-Will Agreement contains many similar sentences. The court struggled to construe the various portions of the provision on which Nav relies in a way that made sense. Subsection (iii)(b) is particularly confusing, if not unintelligible. Accordingly, the court confines its analysis to subsection (iii)(a) of the At-Will Agreement. The court further notes that any ambiguities may be construed against the drafter, which, presumably, is Nav. *See Wert v.*

9

The evidence shows that Fugate served as a consultant for two businesses during the term of the non-compete clause: Pro Finance and Titanium Capital. Thus, the question before the court is whether either of these companies directly compete with or are substantially similar to Nav.[2]

Fugate testified that Pro Finance was primarily in the business of providing credit repair services for a fee. Fugate also testified that Titanium Capital was in the process of establishing a credit repair service to sell to small businesses. Nav also provides credit repair services to its members. But unlike Pro Finance and Titanium Capital, Nav provides its services for free in order to garner the good will of its members. Because Nav does not charge for its credit repair services, it does not appear that Pro Finance or Titanium Capital are "in direct competition" with it.

This leaves the question of whether these two companies are "substantially similar" to Nav and its free credit repair service. There are, of course, some undeniable similarities. Nav, Pro Finance, and Titanium Capital all help small business owners to improve their credit scores to access financing. But the evidence presented during the hearing shows that Pro Finance and Titanium Capital directly profit from selling this service. Nav provides this service for free as an added bonus to small business owners to supplement its core business activity—matching entrepreneurs with lenders. The term "substantially similar" is inherently imprecise. Thus, the question of whether Pro Finance and Titanium Capital are engaged in a business that is substantially similar to Nav's business is a question for the factfinder after considering all of the relevant evidence. *See Laughlin v. Baltalden, Inc.*, 159 A.2d 26, 27–28 (Pa. Super. Ct. 1960)

---

*Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1260 (Pa. 2015); *Brady v. Park*, 445 P.3d 395, 410 (Utah 2019).

[2] The parties focused on the question of whether Fugate's consulting services competed with or were substantially similar to Nav's business. But the non-compete clause does not prohibit competing consulting services; it prohibits Fugate from providing any consulting services to a competing business.

(question of whether a builder breached a contract to build a house that was "substantially similar" to sample house was properly presented to the jury); *KB Squared LLC v. Mem'l Bldg. LLC*, 442 P.3d 1168, 1175 (Utah Ct. App. 2019) ("Whether a party performed under a contract or breached a contract is a question of fact."). At the evidentiary hearing, Nav presented only sparse evidence on this question. More discovery and, perhaps, expert testimony could shed more light on this issue. But at this stage of the litigation, Nav has not shown a reasonable probability of prevailing on its credit repair services claim. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1257 (10th Cir. 2016) (concluding that the plaintiff had not established a substantial likelihood of success on one of its claims due to the absence of evidence in the record supporting the claim).

Fugate also testified that Titanium Capital provides other services to small businesses, including business entity formation, website services, and business plan formation. Although Nav does not provide any of these services, its website has links to partner companies that do. If a Nav customer clicks on one of these links and purchases one of these services, Nav receives a commission. Titanium Capital does not directly compete with Nav on this front because Nav does not provide any of these services. Nor does it appear that Titanium Capital's business model—to provide services to small businesses—is substantially similar to Nav's business model—to advertise the services of other companies in exchange for a commission.

Finally, Fugate testified in passing that Titanium Capital helps business owners to get financing. Based upon this brief statement, it is difficult to know whether Titanium competes with Nav, whether Titanium Capital is a "lender partner" that operates in conjunction with Nav,[3] or whether Titanium Capital provides a service that differs from the services that Nav provides to

---

[3] Nav presented evidence that Titanium Capital is a "Nav BLBA partner."

small businesses. Indeed, Nav's corporate representative testified that "[t]here's not another company just like Nav and so it's kind of a proprietary position we hold in the market," suggesting that it did not have true competitors or peers in the business loan marketplace. Given the lack of evidence regarding Titanium Capital's business model, Nav has not carried its burden of showing that it directly competes with or is substantially similar to Nav.

In short, Nav has not produced evidence establishing a substantial likelihood that it will prevail on its claim that Fugate breached the non-compete clause by providing consulting services to Pro Finance and Titanium Capital.

## II. BUSINESS LOAN BROKER DIRECTORY

On the day of his termination, Fugate created a Facebook group titled BusinessLoanBroker.com. He posted only two messages to the group. First, he stated that he was going to make an announcement. Second, he stated that he was postponing the announcement because he had received a cease-and-desist letter regarding the group. Fugate testified that he had intended to announce the launch of a free business loan broker directory that he would set up at the BusinessLoanBroker.com web address. He believed that a free directory was a good way to maintain his status within the business loan broker community without breaching the non-compete clause. Fugate further testified that after he received the cease-and-desist letter, he stopped all activity related to the Facebook group. He indicated that he would wait until he received further clarity on whether he could legally operate and promote the website before moving forward.

Nav argues that the operation of a free business loan broker directory would breach the non-compete clause of the At-Will Agreement. Thus, it contends that it is entitled to a preliminary injunction prohibiting Fugate from doing so. The court, however, determines that Nav has not shown a substantial likelihood of success on this claim for two reasons.

First, Nav has not shown that the free directory would be a business. The non-compete clause does not prohibit Fugate from engaging in competing activities. It bars him from operating or affiliating with a "business" that competes with Nav or is substantially similar to Nav. Thus, in order to prevail on its breach of contract claim, Nav must first prove that a free broker directory and a Facebook group promoting the directory is a business. A "business" is commonly defined as "[a] commercial enterprise carried on for profits." *Business*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999) ("Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and [courts] may inform [their] understanding of these terms by considering their dictionary definitions." (citations omitted)); *S. Ridge Homeowners' Ass'n v. Brown*, 226 P.3d 758, 759 (Utah Ct. App. 2010) ("In interpreting contracts, 'the ordinary and usual meaning of the words used is given effect,'" which 'ordinary meaning . . . is often best determined through standard, non-legal dictionaries.'" (alteration in original) (citations omitted)). A free broker directory is not a "business" within the common understanding of that term because it is not an enterprise operated for profit.

Second, even if a free broker directory could be defined as a business, Nav has not shown a substantial likelihood that it will succeed on the broker directory claim. A free directory of business loan brokers would not compete directly with Nav. Whether such a directory would be substantially similar to Nav's business is a closer question. Nav is in the business of convincing small business owners to use its online search tools to find lenders willing to extend a loan. A free directory of business loan brokers could be used by small business owners to find a broker, who would then help the owner find a lender. A free directory is not wholly dissimilar to Nav's business model because the directory would be used by the same target customer: business owners looking

for financing. However, there are key differences between Nav and Fugate's proposed directory. The directory would not directly match borrowers with lenders; it would help entrepreneurs to find a broker, who would, in turn, perform this service. Moreover, the evidence currently before the court indicates that Fugate would not profit from the directory, while Nav presumably earns commissions for finding loans for small business owners.

The question of whether a free broker directory is substantially similar to Nav's business would be a question for the factfinder after considering all of the relevant evidence. Because the contours of both Fugate's proposed directory and Nav's business model are ill-defined at this stage of the litigation, it is difficult to accurately predict the outcome of Nav's claim that the directory would be substantially similar to Nav's business.

Accordingly, Nav has not shown a substantial likelihood that it will prevail on its claim that the proposed broker directory would violate the non-compete clause.

### III. FUGATE'S MATERIAL BREACH DEFENSE

At the evidentiary hearing, Fugate argued that Nav failed to show that it would prevail on the merits for an additional reason—Nav materially breached the Purchase Agreement and the Employment Agreement, excusing Fugate's performance under the non-compete clause found in the At-Will Agreement. Because the Purchase Agreement, the Employment Agreement, and the At-Will Agreement were signed contemporaneously and the parties agree that they intended these documents to memorialize a single agreement, the court finds that they form a single contract. *See Sacramento Baseball Club, Inc. v. Great N. Baseball Co.*, 748 P.2d 1058, 1060 (Utah 1987) ("An agreement may be a single contract even though it consists of several writings that the parties have never physically attached to each other."); *Bullfrog Marina, Inc. v. Lentz*, 501 P.2d 266, 271 (Utah 1972) ("[W]here two or more instruments are executed by the same parties contemporaneously

. . . and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties, although they do not in terms refer to each other."). Accordingly, any material breaches of the Purchase Agreement or the Employment Agreement on Nav's part could negate Fugate's obligations under the At-Will Agreement.

To evaluate the likelihood that Fugate will prevail on his material breach argument, the court must first determine the probability of proving the alleged breaches. The court must then evaluate the likelihood that any breaches would be deemed material.

First, Fugate argues that Nav breached the Purchase Agreement by failing to transfer 9,932 shares of its common stock to him on the closing date of the acquisition of BLBA in November 2019. Although Nav offered to transfer the stock to Fugate 14 months later, Nav would only complete the transfer if Fugate signed a separate Adoption Agreement. There appears to be no question that Nav breached the letter of the Purchase Agreement. But it less clear whether Nav's tardy and conditional offer to transfer the stock would constitute substantial performance, which would preclude a finding of material breach. *See In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013) ("[E]quity . . . . will disregard a forfeiture occasioned by failure to comply with the very letter of an agreement when it has been substantially performed.").

Second, Fugate argues that Nav breached the Employment Agreement by refusing to remit the full amount of the severance pay and benefits outlined in that contract. Under the Employment Agreement, Nav could avoid its severance pay obligations if it fired Fugate for "cause," which is defined by the contract to be:

> fraud, embezzlement, theft, . . . [Fugate's] gross misconduct that is materially injurious to [Nav], . . . [Fuagte's] continued substantial violations of his employment duties after [Fugate] has received a written demand for performance from [Nav] that specifically sets

15

> forth the factual basis for [Nav's] belief that [Fuagte] has not substantially performed his duties; and . . . [Fugate's] conviction of, or plea of nolo contendere to, a felony.

Nav asserted that it terminated Fugate for cause because it had provided a "written demand for performance" through Jensen's instant messages and text messages to him. But whether informal instant messages and text messages constitute a "written demand" is questionable. Moreover, it is somewhat doubtful that Jensen's informal criticisms and vague statement that he needed to know whether Fugate would "step up through November" constituted a "demand for performance . . . that specifically sets forth the factual basis for [Nav's] belief that [Fuagte had] not substantially performed his duties." Thus, although more facts may be forthcoming, Fugate has made a strong showing that Nav terminated him without cause and failed to offer him the severance package to which he was entitled under the Employment Agreement.

Of course, breaches of the Purchase Agreement and the Employment Agreement would only excuse Fugate's performance under the non-compete clause if those breaches are deemed material. The question of whether a breach is material is a fact question for the jury. *Ewell v. Those Certain Underwriters of Lloyd's, London*, No. CIV.A.S09C-07-031RFS, 2010 WL 3447570, at *7 (Del. Super. Ct. Aug. 27, 2010); *Orlob v. Wasatch Med. Mgmt.*, 124 P.3d 269, 275 (Utah Ct. App. 2005). Whether a breach is material turns on the following factors:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform will suffer forfeiture; (d) the likelihood that the party failing to perform will cure his failure, taking account of all the circumstances; (e) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing.

*Ewell*, 2010 WL 3447570, at *6 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)); *Cross v. Olsen*, 303 P.3d 1030, 1036 (Utah Ct. App. 2013) (same). The question of whether any

breaches of the Purchase Agreement and the Employment Agreement were material turns on a multi-factor analysis involving facts that the parties have not yet presented to the court. Thus, it is difficult to predict whether Fugate will prevail on his material breach argument. But Nav has not come forward with evidence conclusively disproving Fugate's material breach theory. Because there is a reasonable possibility that Fugate will succeed on the merits, his material breach argument contributes to the uncertainty as to who will prevail on Nav's breach of contract claim.

## IV. CONCLUSION

To obtain a preliminary injunction, Nav must show a substantial likelihood that it will prevail on the merits of its claim that Fugate has or will breach the non-compete clause. In other words, Nav must demonstrate more than a bare probability of success; it must prove that the likelihood of prevailing is substantial. Moreover, Nav must make a "*clear showing*" that it has met it burden. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). For the reasons stated above, it is difficult to predict which party might prevail on Nav's breach of contract claim at this juncture. Because there is substantial doubt as to which party will ultimately succeed in the end, Nav has not met its burden of proving a substantial likelihood of success on the merits.

Establishing a likelihood of success is a necessary requirement for a preliminary injunction. *Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1193–94 (D.N.M. 2020) ("Likelihood of success on the merits is the threshold issue . . . ."). Accordingly, the court need not address the other prerequisites for granting an injunction. Nav.'s motion for a preliminary injunction is denied.

## ORDER OF THE COURT

The court ORDERS as follows:

1. Nav's motion for a preliminary injunction is DENIED.

2. The temporary restraining order entered by the court on June 23, 2021, is hereby dissolved.

DATED July 15, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge